# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF TEXAS,
# AUSTIN DIVISION

| | | |
|---|---|---|
| Sierra Club, | § | |
| | § | |
| Plaintiff | § | |
| v. | § | |
| | § | |
| The Federal Highway Administration; Hon. | § | Civil Action No. |
| Victor M. Mendez, in his official capacity as | § | |
| Administrator of the Federal Highway | § | 1:12-cv-116 |
| Administration; the Texas Department of | § | |
| Transportation; and Phil Wilson in his capacity | § | |
| as Executive Director of the Texas Department | § | |
| of Transportation, | § | |
| | § | |
| Defendants | | |

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

Brief Overview of this Complaint

1. El Paso city fathers and influential development interests have decided that widening and adding overpasses to a small existing roadway through a high-desert park north of El Paso would open the down-slope areas to residential and commercial development. This widening project (sometimes referred to as the "033 Project") entails a number of federal approvals; so the requirements of the National Environmental Policy Act ("NEPA") and, potentially, of "Section 4(f)" (*i.e.*, the "parkland use" restrictions) of the Department of Transportation Act of 1966, 23 U.S.C. § 138, must be satisfied.

2. The Federal Highway Administration, however, has determined that only the first stage of NEPA analysis need be undertaken as a requisite to commencing the project; and it has concurred that no Section 4(f) analysis, at all, need be undertaken, since it has rejected claims that there will be constructive "use" of park resources.

3. On the other hand, many local citizens, including members of the Sierra Club, believe the first-level NEPA analysis was unreasonably narrowed (*e.g.*, project alternatives were prematurely discarded) and that prejudgments about the desired outcome of the analysis rendered it, really, just a post-hoc rationalization to support the widening/upgrading project. They believe, contrary to the conclusion of the first-stage NEPA analysis, that the project will and, certainly, may degrade some quality of the human environment. Collectively, these failings wrongly cut off the NEPA process at the first level of analysis. They also believe the increased light and noise pollution and visual incongruities arising from the project, including its contribution to urbanization of the Loop 375 corridor, and its impacts on parkland wildlife constructively use the parkland, thus necessitating the foregone Section 4(f) evaluation.

4. Plaintiff seeks a declaration that its views are correct, and it seeks a ban on construction of the project until both a full NEPA analysis and a Section 4(f) evaluation have been prepared and approved.

Parties

5. Plaintiff Sierra Club is a national nonprofit environmental organization with its national headquarters located at 85 Second Street, 2nd Floor, San Francisco, CA 94105. Since 1892, the Sierra Club has been working to protect communities, wild places, and the natural beauty of the countryside, parks and recreation lands, wildlife and waterfowl refuges and historic sites. The Sierra Club is a membership organization with roughly 1.4 million members, a number of whom use the Franklin Mountains State Park for recreational outdoor pursuits (*e.g.*, hiking, camping, nature watching, and relaxation).

6. Defendant Federal Highway Administration ("FHWA") is an agency of the United States Department of Transportation, itself, a department of the United States. It is ultimately responsible for the compliance of Loop 375 development with the National Environmental Policy Act and Section 4(f) of the US Department of Transportation Act of 1966.[1] It may be served at 1200 New Jersey Ave., S.E., Washington, D.C., 20590.

7. Hon. Victor M. Mendez is the Administrator of the Federal Highway Administration. It was by his delegation that Texas District "B" Engineer Gregory S. Punske signed the approval of the Administration that is the final agency action complained of in this suit. Mr. Mendez is sued in his capacity as Administrator. He may be served at 1200 New Jersey Ave., S.E., Washington, D.C., 20590.

8. Texas Department of Transportation ("TxDoT") is a state agency of the State of Texas. It is the sponsoring agency for Loop 375, oversaw preparation of environmental documentation for the project, and will oversee construction of the project. It may be served at 125 E. 11th Street, Austin, Texas, 78701-2483.

9. Phil Wilson is the Executive Director of the Texas Department of Transportation. He is sued in his official capacity. He may be served at 125 E. 11th Street, Austin, Texas, 78701-2483.

Jurisdiction and venue

10. This Court has jurisdiction of this action under 28 U.S.C. § 1331 (federal question).

11. Venue is proper in this District under 28 U.S.C. § 1391(e), because Defendant Federal Highway Administration is an agency of the federal government, Defendant Victor Mendez is an officer of that agency, and because a substantial part of the omissions

---

[1] Now, 49 U.S.C. § 1653(f).

giving rise to this action occurred in the District, which is also where the property that is the subject of this action is located.  The state Defendants reside in this District.

Facts

12. Loop 375 is most of a loop highway around El Paso, Texas; the western fourth of the loop is presently provided by IH-10 and an adjoining highway.  See the map, below, reflecting the 033 Project at issue, here, and the northwestern side of El Paso.  Loop 375 cuts through the Franklin Mountains State Park for about 3.5 miles, beginning about a half mile west of the "Eastern Terminus" point on the map and continuing to the east to the western boundary of the Fort Bliss Military Base.  (The distance from the Western Terminus to SH 54 on the eastern side of Fort Bliss is roughly 10 miles, of which, the 033 Project is about 3.6 miles.)

13. 

14. The portion of Loop 375 that is to be expanded by the 033 Project is presently a two-lane undivided highway for the first 3.1 miles (from west to east) and a 4-lane divided highway for the last half mile. The 033 Project will result in a 4-lane highway covering the full 3.6 miles, with 1-lane frontage roads and bicycle lanes for about 2.6 miles of this distance, and with four new overpasses to accommodate north-south crossing streets (some existing and some not). The 033 Project will add fly-overs for Loop 375 access to and from IH-10. The 033 Project will add elevated street lighting at overpasses and to the western 2.6 miles of the highway. El Paso zoning relaxation granted to help secure right-of-way for the proposed 033 Project will allow commercial development along the Project corridor.

15. Franklin Mountains State Park was created by an Act of the Texas State Legislature in 1979 to "provide lasting protection to the outstanding scenic, ecological, and historic features of the Franklin Mountains so they could be enjoyed and appreciated by present and future generations." The mountains themselves, for the most part, lie immediately north of Loop 375. Texas Parks and Wildlife Department acquired the property in 1981, and the Park was opened to the public in 1987. The park is large, covering 24,247 acres or some 37 square miles. It is all within the city limits of El Paso. The park provides habitat for various forms of wildlife and is a recreation and natural area of El Pasoans and others; and the El Paso Convention and Visitors' Bureau often highlights the park in promoting tourism in the area. In 2007, nearly 50,000 people visited the park for activities including picnicking, hiking, camping, biking, rock climbing, star gazing, and cave exploration. Bird watching is also popular in the park, as the mountain range is part of the central flyway for migratory birds traveling between Mexico and Canada. The 033

      Project will require construction of a temporary access road to the park; after completion of the 033 Project, traffic leaving the Park will travel west about 1 & 1/3 miles, before a U-turn at the future Paseo del Norte crossing of Loop 375 will allow traffic to turn back to the east.

16. Defendant TxDoT prepared the Environmental Assessment for the 033 Project. It rejected a mass-transit project alternative immediately, concluding it would not meet the need and purpose standards for the project. It, then, devised a "no build" and four roadway alternatives, all on the same alignment. The configuration described in Paragraph 14, above, was "Alternative 5;" other alternatives were roads or boulevards of less carrying capacity than Alternative 5. These alternatives were compared on the bases of their mobility and public-safety attributes. Only the alternative described in Paragraph 14 included grade separations at north-south cross streets; so that was by far the best alternative, in terms of projected intersection congestion and speed of transit through the length of the 033 Project. In short order and with no examination of their respective environmental impacts, all the alternatives, except the no-build and Alternative 5 were rejected.

17. The Environmental Assessment then addressed a number of environmental and community variables, generally comparing the impacts of the build (*i.e.*, Alternative 5) and the no build alternatives on those variables. It concluded that the no build alternative was less environmentally harmful, but that it would not meet the purpose and need for the project. It concluded that the build alternative, Alternative 5, while having the more severe environmental impacts of the two, would, nonetheless, not have a significant impact on the human environment.

18. No Section 4(f) evaluation was undertaken for the 033 Project.  In their Finding of No Significant Impact ("FONSI"), which supports the decision to forgo an Environmental Impact Statement on the project, federal Defendants contend no Section 4(f) analysis is required, because the 033 Project will not use, either directly or constructively, Section 4(f) resources.

19. Texas Parks and Wildlife Department, the agency charged with the management of the Franklin Mountains State Park and its 4(f) resources, met with Defendant TxDoT officials to urge, among other things, that there be wildlife crossings beneath the project at three locations in the Park to help maintain species connectivity between the north and south Park units.  Although Defendant TxDoT acknowledged in response to public comments that "roadways and vehicle traffic contribute to wildlife mortality," it has declined on cost grounds to provide any wildlife crossings within the Park.  Defendant TxDoT has designed an arched 10-foot-tall culvert and identified a potential location for it west of the Park, but Defendant has made no commitment to construct even this meager wildlife crossing.

20. The Environmental Assessment acknowledged that the 033 Project will introduce continuous street lighting above the highway from IH-10 to Paseo del Norte (roughly, 2.6 miles) and that this and overpass lighting will "change the night-time visual landscape of the project area."  The Environmental Assessment concludes, though not on the bases of any data or comparable examples, that the change in the visual landscape will not adversely affect Park users, because campgrounds in the Park are about 0.7 mile north of Loop 375 and the landscape is undulating.  The Park impacts of the more numerous vehicle night-time lights are not addressed at all.  The Park impacts of vehicles rising at

night to cross the elevated overpasses at the four intersections are not addressed at all. Light-induced changes in predator-prey behavior or in animals' abilities to orient themselves at night are not addressed at all.

21. The Environmental Assessment considered noise impacts from the 033 Project at two commercial sites just south of the project's flyover to IH-10 East (actually, in a south direction at that point), which is at the far western end of the project. In response to public comments that this analysis ignored noise impacts in the Park, TxDoT undertook an analysis of noise impacts at a trailhead near, but still not in, the Park. This analysis determined Project 033 would increase noise levels at the trailhead, but that the post-project level of noise would be not be so great as to impact human "Category C" land uses. These land uses include a very broad range of sites, such as "active sport areas, amphitheaters, . . . campgrounds, . . . playgrounds, . . . and trail crossings."[2]

22. TxDoT undertook no analysis of 033 Project noise impacts on humans at any area in the Franklin Mountains State Park; it measured nothing about noise levels or the frequency or degree of change of noise levels either presently or post-Project 033 at hike-in camp sites (or any camp sites) within the park; and it undertook no analysis of noise impacts on wildlife anywhere. The Federal Highway Administration, from which TxDoT took its noise impact criteria, warns:

> It is important to remember that 23 CFR 772 is concerned with noise impacts on the human environment. Extrapolation of impact thresholds

---

[2] The full range of examples is: "Active sport areas, amphitheaters, auditoriums, campgrounds, cemeteries, day care centers, hospitals, libraries, medical facilities, parks, picnic areas, places of worship, playgrounds, public meeting rooms, public or nonprofit institutional structures, radio studios, recording studios, recreation areas, Section 4(f) sites, schools, television studios, trails, and trail crossings." 23 C.F.R. § 772.11.

within the regulation to other species requires an incorrect interpretation of the regulation and the Noise Abatement Criteria.[3]

23. The Loop 375 roadway corridor is a desert landscape with mostly unimpacted, *i.e.*, "natural," views in all directions and provides the scenic visual foreground to the Franklin Mountains State Park. Widening of Loop 375 is likely to facilitate and accelerate the urban development of the corridor of the loop, bringing that development to the Park's boundaries, where it would otherwise never occur. TxDoT acknowledges that increased future urbanization could alter the existing visual character of the region, such as by disrupting currently unobstructed scenic viewsheds. But, FHWA defended its unconcern with the visual impacts of the project on its surroundings by reciting that "views of the Franklin Mountains from south of Loop 375 will not be *fully* obstructed." (Emphasis added.) FHWA, in its FONSI, also lays the future blame for visual impacts not on the project, but, instead, on "locally-planned future development in the region."

24. The Environmental Assessment and TxDoT response to comments concluded that indirect and cumulative impacts to land use, vegetation and wildlife habitat, water resources, and air quality are possible but that reasonably foreseeable development "is anticipated to occur regardless of whether the project is constructed." In its response to comments on the Environmental Assessment, TxDoT explained that its definition of the development that is reasonably foreseeable extended to "projects that were identified through consultation with City of El Paso planning staff, and those undertakings that have been planned and/or platted." TxDoT did not evaluate whether planned and/or platted

---

[3] 75 Fed. Reg. 39820, 39827 (July 13, 2010). There are multiple reasons for this warning, but one significant one is that the metric for measuring noise, frequently written as "dbA," is "A" weighted to reflect the hearing range of humans.

future undertakings, themselves, incorporated the assumption of the 033 Project and would be delayed, reduced in scope or abandoned, in the absence of the 033 Project.

Controlling law

(1) Administrative Procedure Act

25. The Administrative Procedure Act, 5 U.S.C §§ 551, *et seq.,* waives a federal agency's sovereign immunity from suit in specified instances. It also requires that federal agency actions and decisions follow all statutorily prescribed procedures and comply with all applicable laws. The APA also authorizes a reviewing court to "hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law . . . ." 5 U.S.C § 706(2). Both the federal decisions not to prepare an Environmental Impact Statement and to forgo preparation of a Section 4(f) evaluation are subject to this standard of review.

(2) National Environmental Policy Act ("NEPA")

26. NEPA is the "basic national charter for protection of the environment." 40 C.F.R. § 1500.1. The statute requires federal agencies to identify and consider the environmental impacts of proposed federal actions and obligates federal agencies to consider alternatives, as well as measures that could avoid or reduce adverse impacts, *before* taking action to assist or approve a project that may significantly affect the environment.

27. For any proposed major federal action that may significantly affect the quality of the human environment, such as federal approval of the Loop 375, NEPA requires "a detailed statement" that fully analyzes "the environmental impact of the proposed action" and its alternatives. 42 U.S.C. § 4332 (2)(C)*;* 40 C.F.R. § 1502.14.

28. An environmental assessment may be and frequently is prepared to evaluate whether the proposed action may significantly affect some element of the human environment. A line of Fifth Circuit cases sets out the legal standard separating the two possible outcomes of an environmental assessment—a Finding of No Significant Impact, which obviates the need to prepare or preparation of an Environmental Impact Statement ("EIS"):

> The National Environmental Policy Act requires all government agencies to prepare an EIS whenever the agency recommends "major Federal actions significantly affecting the quality of the human environment." (Citation omitted.) The government's mandatory regulations interpreting the National Environmental Policy Act state that "'affecting' means will or *may* have an effect on." 40 C.F.R. § 1508.3 (emphasis added [by the Court of Appeals). . . . Otherwise, the government could issue a "finding of no significant impact," which is "a document . . . briefly presenting the reasons why an action . . . will *not* have an effect on the human environment." 40 C.F.R. § 1508.13.

*Louisiana ex rel. Guste v. Lee*, 853 F.2d 1219, 1222-1223 (5th Cir. 1988) (Corps of Engineers permit renewal would degrade the quality of some human environmental factors); *accord Fritiofson v. Alexander*, 772 F.2d 1225 (5th Cir. 1985) (remand of FONSI in light of inadequate EA consideration of cumulative impacts); *Citizen Advocates for Responsible Expansion (I-CARE) v. Dole*, 770 F.2d 423 (5th Cir. 1985) (FONSI inappropriate for highway expansion that could significantly affect the environment; belated 4(f) study inadequate).

29. The NEPA mandate is intended to inject environmental considerations into the federal agency's decision-making process, to inform the public and to ensure all that the agency took a "hard look" at environmental concerns *prior* to making a decision to proceed with the project. The Environmental Impact Statement ("EIS") serves as a means of assessing environmental impact, rather than justifying decisions already made. 40 C.F.R. § 1502.2(g).

30. The alternatives analysis "is the heart of the environmental impact statement," and NEPA requires federal agencies to "[r]igorously explore and objectively evaluate all reasonable alternatives," including "the alternative of no action," and "[d]evote substantial treatment to each alternative considered in detail including the proposed action so that reviewers may evaluate their comparative merits." 40 C.F.R. § 1502.14. A properly conducted alternatives evaluation is linked to the evaluation of environmental consequences and therefore is inherently flawed by any failure to adequately consider the environmental consequences of a proposed action. An agency must use the NEPA process to identify and assess the reasonable alternatives to proposed actions that will avoid or minimize adverse effects of these actions upon the quality of the environment.

31. As part of its duty to present a full and fair discussion of significant environmental impacts, an agency must include consideration not only of those impacts that may be directly attributable to the proposed action, but also indirect and cumulative impacts as well. 40 C.F.R. § 1502.16; *see also* 40 C.F.R. §§ 1508.7, 1508.8, & 1508.27. Indirect impacts are those caused by the action and are later in time or farther removed in distance, but are still reasonably foreseeable. Cumulative impacts are the impacts on the environment that result from the incremental impact of a project when added to other past, present, and reasonably foreseeable future actions, regardless of what agency (either federal or non-federal) or person undertakes such other actions. For federal highway projects, an EIS must include consideration of the impacts of increased demand for travel created by the proposed project, as well as future secondary and cumulative land use impacts. The Fifth Circuit, in a similar case, has stated, "The fact that the private development surrounding the highway and the Earl Bond Road interchange does not

result from direct federal action does not lessen the appellee's duty . . . . [A]ppellees do control this development to the extent that they control the placement of the highway and interchanges." *National Wildlife Federation v. Coleman*, 529 F. 2d 359, 374 (5th Cir. 1976) (addressing application of the Endangered Species Act and citing *City of Davis v. Coleman*, 521 F. 2d 661, 676-678 (9th Cir. 1975) (EIS for a road must analyze the impacts of development that the road is designed to accommodate)).

32. Finally, FHWA regulations implementing NEPA require FHWA to give consideration to mitigation measures to avoid or minimize environmental harm. Proposed mitigation measures must be included in the EIS and the Record of Decision. 23 C.F.R. §§ 771.126 & 777.127.

(3)  Department of Transportation Act, Section 4(f)

33. Section 4(f) of the Department of Transportation Act, 49 U.S.C. § 303 and 23 U.S.C. § 138, provides that the Secretary of Transportation "shall not approve any program or project . . . which requires the use of any publicly owned land from a public park, recreation area, or wildlife and waterfowl refuge of national, State, or local significance as determined by the Federal, State or local officials having jurisdiction thereof, or any land from an historic site of national, State, or local significance as so determined by such officials unless and until certain statutory provisions are satisfactorily discharged." The Supreme Court has said this provision means protection of section 4(f) lands "was to be given paramount importance." *Citizens to Preserve Overton Park, Inc.* v. *Volpe,* 401 U.S. 402, 412-413 (1971).

34. The use may be physical, as when land is taken from a park for roadway right of way. Also, however, the Fifth Circuit has determined that the term "use" in section 4(f) should

be construed broadly and embraces the constructive use doctrine. To constitute a constructive use, the off-site activities of the proposed project must impair substantially the value of the site in terms of its environmental, ecological, or historical significance. *Citizen Advocates for Responsible Expansion, Inc. (I-CARE) v. Dole*, 770 F.2d 423, 441 (5th Cir. 1985). Thus, noise, light, visual incongruities, and modifications to parkland wildlife behaviors arising from a project may give rise to the constructive taking of nearby 4(f) properties. *See id.*; *Coalition Against a Raised Expressway, Inc. v. Dole*, 835 F.2d 803, 812 (11th Cir. 1988).

35. When a Section 4(f) evaluation is required, the authorizing federal agency must determine that (1) "there is no prudent and feasible alternative to using that land," and (2) that the project "includes all possible planning to minimize harm to the park, recreation area, wildlife and waterfowl refuge, or historic site resulting from the use." 49 U.S.C. § 303(c) and 23 U.S.C. § 138. An alternative is feasible, unless "as a matter of sound engineering" it should not be built. *Overton Park*, 401 U.S. at 411. An alternative is considered imprudent under section 4(f) only if "there are unique problems" involved in the use of the alternative. *Id.* at 412.

Claims

36. ***Claim 1, NEPA***:   Plaintiff contends perceived financial exigencies so rushed the NEPA analysis of Loop 375 as to lead to prejudgment of the outcome of that analysis. At the time of the analysis, there was a perceived necessity to act quickly in order to retain the option to use legislatively-granted funds for the project. On multiple occasions, Mr. Charles ("Chuck") Berry, District TxDoT Engineer for the El Paso district, spoke to the City Council about the project. His presentations left council members with the

impression that if they waited to act on various real-estate-developer requests related to the project, the funds for the project would disappear. That impression was fostered by, for example, Mr. Berry's October 5, 2010, comment during a discussion of the necessity for the Council to approve zoning changes to accommodate the project. He said that any delay would threaten funding and that the more quickly the Council acted, the better off the project would be. City Manager Joyce Wilson also discussed at this meeting expediting the decision-making process. Similar comments were made by Mr. Berry on August 10, 2010 (*e.g.*, "The legislature . . . may rescind projects that haven't been bid by January."), November 30, 2010 (reiterating the risk to public funds of waiting), and on several other occasions.

37. Thus, Plaintiff contends Federal Defendants' August 17, 2011, approval of the *Finding of No Significant Impact for Loop 375 (Transmountain Road) from IH-10 to 0.479 Miles East of the Tom Mays Unit of the Franklin Mountains State Park, El Paso County, Texas, CSJ:2552-01-033* was arbitrary, capricious and not in accordance with law for, among other reasons that may be established in litigation, the reasons that it rests on (a) the premature elimination during the NEPA process of project alternatives, (b) the determination that no quality of the human environment could be significantly adversely affected by the 033 Project (*i.e.*, that it could forgo preparation of an EIS on the project), and (c) prejudgment of the outcome of the NEPA analysis by key decision makers directing that analysis.

38. *Claim 2, Section 4(f)*: Plaintiff contends Federal Defendants' determination, announced in the August 17, 2011, FONSI, that a Section 4(f) determination is not needed for the 033 Project because that project will not constructively use parkland, was arbitrary,

capricious and not in accordance with law for, among other reasons that may be established in litigation, the reasons that, noise, light, visual incongruities and modifications to parkland wildlife behaviors arising from the project (including its contributions to urbanization near the park) will substantially impair the value of the park in terms of its environmental and ecological significance.

**Prayer**

  Plaintiff prays this Court, after hearing and consideration of briefs and evidence, declare the Federal Defendants' approval of the FONSI for Project 033 and their failure to undertake a Section 4(f) evaluation to have been arbitrary, capricious and not in accordance with law.  Plaintiff prays that, on so finding, the Court set aside those decisions and enjoin all Defendants from further development, save for environmental studies and project design work, of a highway project from IH-10 to 0.479 mile east of the Tom Mays Unit of the Franklin Mountains State Park.  Plaintiff also prays for any other relief to which it may show itself entitled.

                Respectfully submitted,

            By:   /s/ David Frederick
                David Frederick
                SBT No. 07412300
                Brad Rockwell
                SBT No. 017129600

                Lowerre, Frederick, Perales,
                Allmon & Rockwell
                707 Rio Grande St., Ste.  200
                Austin, Texas 78701

                COUNSEL FOR SIERRA CLUB